ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2005 AUG 10 AM 8: 19

CLERK _____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

MICHAEL HARRISON, )
)
Plaintiff, )
)
v. ) CV 304-012
)
ANTHONY WASHINGTON, Warden, )
et al., )
)
Defendants. )

---

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff Michael Harrison, a *pro se* litigant, commenced this civil action pursuant to 42 U.S.C. § 1983. The matter is now before the Court on cross motions for summary judgment. (Doc. nos. 34 & 39). For the reasons stated more fully below, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that Plaintiff's motion for summary judgment be **DENIED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

### I. FACTS

Plaintiff was formerly incarcerated at Milan State Prison ("MSP") in Milan, Georgia. During the time periods relevant to this lawsuit, Defendants held the following positions at MSP: Anthony Washington, Warden, Tim Spires, Deputy Warden of Security, Care and Treatment, William Sumner, Lieutenant, and Darlene Ashley, Correctional Officer. Warden Washington oversees the functioning of the entire MSP. (Doc. no. 41, Ex. B, Washington

Aff. ¶ 14). Deputy Warden Spires is responsible for the overall day-to-day supervision of the safety and security of the institution, inmates, and associated personnel, but he was not involved with the October 6, 2003 incident forming the basis for this lawsuit. (Doc. no. 41, Ex. C, Spires Aff. ¶ 3). Defendant Sumner was a lieutenant at the time of the events in question, with responsibility for overseeing the correctional officers under his command. (Doc. no. 41, Ex. D, Sumner Aff. ¶ 4). Defendant Ashley is a correctional officer who was assigned to work in the recreation area of MSP on October 6, 2003. (Doc. no. 41, Ex. A, Ashley Aff. ¶¶ 1, 3). The Court sanctioned claims against Defendants Washington, Spires, and Ashley based on allegations that they failed to protect Plaintiff from a known threat to his safety and against Defendants Washington and Sumner based on allegations that they were deliberately indifferent to a serious medical need.

On October 6, 2003, Plaintiff played a game of "pickle-ball" in the gym at MSP. (Doc. no. 12, Amd. Compl., p. 5).[1] At the conclusion of a game that Plaintiff won, he and his defeated opponent, Inmate Williams, exchanged heated words.[2] Defendant Ashley broke up the exchange, confirmed with Inmate Williams that the altercation was finished, escorted him out of the gym, and watched him begin to play basketball with other inmates.[3] (Ashley

---

[1] Plaintiff did not, as required by Loc. R. 56.1, submit a statement of material facts with his motion for summary judgment.

[2] Inmate witness accounts variously describe Plaintiff as "getting in Williams' face" (Doc. no. 41, Ex. L, Incident Rpt., Botelho Stm., Henry Stm.) or Inmate Williams as threatening Plaintiff. (Doc. no. 47, Ex. E, Farmer Stm.).

[3] Plaintiff has submitted a witness statement from fellow inmate James Scott which states that he warned Defendant Ashley that Inmate Williams was a "loaded gun" when she returned from escorting him out of the gym. (Doc. no. 1, Attach., Scott Stm.).

2

Aff. ¶ 3). Between five to fifteen minutes later, Inmate Williams ran into the gym and hit Plaintiff over the head with a mop stick. (Doc. no. 47, p. 9; Washington Aff. ¶ 4). The mop had been hanging in the fence to dry after use by an orderly earlier in the day to mop the floor.[4] (Ashley Aff. ¶ 7). When Defendant Ashley saw Inmate Williams run into the gym and hit Plaintiff, she immediately ran to the altercation and radioed for assistance; she placed herself between Inmate Williams and Plaintiff until other prison officials arrived to remove Inmate Williams. (Id. ¶ 4).

Inmate Williams had previously been on gym restriction for thirty (30) days, but that restriction had ended on September 18, 2003. (Washington Aff. ¶ 24). Despite Inmate Williams's previous disciplinary issues, there was no prior history of problems between Plaintiff and Inmate Williams. (Id. ¶ 10). In fact, Plaintiff reported that prior to the pickle-ball game, he had never encountered Inmate Williams. (Doc. no. 41, Ex. L, Pl.'s Witness Stm.). After Inmate Williams hit Plaintiff, he was handcuffed, taken to security, and received a disciplinary report for intentionally causing injury to another inmate. (Ashley Aff. ¶ 6). Plaintiff did not have any disciplinary action taken against him. (Id.; doc. no. 41, Ex. L, Incident Rpt.).

Plaintiff was taken to the Dodge County Hospital Emergency Room and then to the Medical Center of Central Georgia for treatment. He was discharged by Charles Wall, M.D. on October 9, 2003 and returned to MSP. (Doc. no. 47, Ex. B, pp. 30-32 (Discharge Summary and Instructions)). The Discharge Instructions, *inter alia*, cleared Plaintiff for light

---

[4]Mops and brooms are in constant use throughout the day by assigned orderlies to maintain acceptable sanitation levels and are accounted for at the end of each work day. (Ashley Aff. ¶ 7).

3

activity, instructed Plaintiff to "keep collar on for comfort," and listed multiple prescriptions that Plaintiff was to take upon leaving. (Id. at 32). However, the discharge papers were not sent back to MSP at the time Plaintiff was discharged, and the medical staff at MSP determined that Plaintiff should not return to the general population until the discharge paperwork was received. (Hall Aff. ¶ 4). Because MSP does not have an infirmary, placing sick and injured inmates in segregation is the only option to house them away from the general population. (Id. ¶ 3). However, inmates in segregation retain the same privileges as inmates in the general population, the mattresses used in segregation are the same as the mattresses issued to the general population, and the segregation cell in which Plaintiff spent his first six days back at MSP with one other inmate was designed for two prisoners. (Washington Aff. ¶¶ 20-21). Notably, as neither Warden Washington nor Lt. Sumner are medically trained to provide medical treatment to inmates (Washington Aff. ¶ 14; doc. no. 41, Ex. D, Sumner Aff. ¶ 4), Georgia Department of Corrections Standard Operating Procedures ("SOP") require that they defer to medical staff on issues of medical care and treatment. (Doc. no. 41, Ex. G, SOP VH01-0002).

Plaintiff's vital signs were checked on October 10, 2003 by Staff Nurse Johnna Hall, and she also explained to Plaintiff that until his discharge papers were received from the hospital, he would be housed in segregation. (Hall Aff. ¶ 4; doc. no. 41, Ex. F, Medical Records, p. 46). A follow up examination with Dr. Okuwobi was scheduled for October 15, 2003. (Hall Aff. ¶ 4). Plaintiff also received prescription medication during his stay in segregation. (Doc. no. 41, Ex. F, pp. 8, 33, 78-79). At that October 15th appointment with Dr. Okuwobi, Plaintiff reported that he was "doing well," and Dr. Okuwobi noted that

4

Plaintiff's "otorrhagia" resulting from his head trauma had resolved; no follow-up visit was scheduled. (Id. at 32). After his examination by Dr. Okuwobi, Plaintiff was released from segregation back to the general population on October 15, 2003. (Id. at 46).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Applicable substantive law identifies which facts are material in a given case.[5] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929

---

[5]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t[he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

5

F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Clark, 929 F.2d at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### III. DISCUSSION

A. **Plaintiff Has Failed to Establish That Any Defendant Was Deliberately Indifferent to His Safety.**

The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement. Accordingly, a prison inmate has a constitutional right to be protected from violence and from physical assault by other inmates. Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984)(*per curiam*); Gullatte v. Potts, 654 F.2d 1007, 1012 (5th

6

Cir. Unit B Aug. 1981). When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment imposes a duty to provide reasonable protection. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990)(*per curiam*). However, "[t]his does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials." Gullatte, 654 F.2d at 1012. "[T]here must be at least some allegation of a conscious or callous indifference to a prisoner's rights" that would raise the tort to the level of a constitutional violation in order to state a section 1983 cause of action against prison officials for cruel and unusual punishment. Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982) (citations omitted).

Furthermore, Plaintiff's Eighth Amendment claim with respect to his safety is judged by the deliberate indifference standard and must meet two requirements, one objective and one subjective. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 303 (1991). Plaintiff must first prove by a preponderance of the evidence that he suffered a deprivation that is "objectively, 'sufficiently serious,'" which means that Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm. Farmer, 511 U.S. at 834.

Plaintiff must then also prove by a preponderance of the evidence that Defendants knew of an excessive risk to his health or safety and were subjectively reckless to that risk. See id. at 837. Plaintiff must prove that Defendants had a "sufficiently culpable state of mind." Id. at 834. That is, mere negligent failure to protect Plaintiff from Inmate Williams does not justify § 1983 liability. See Brown, 894 F.2d at 1537. Stated otherwise, Eighth

7

Amendment liability cannot be based on simple negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk. Farmer, 511 U.S. at 835-39; see also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (requiring a plaintiff to show "more than mere negligence," and stating that courts are to look for "obduracy and wantonness, not inadvertence or error in good faith.").

"The known risk of injury must be 'a strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." Brown, 894 F.2d at 1537 (citation omitted). To state the proposition differently, Defendants must have both been aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also have drawn the inference. See Farmer, 511 U.S. at 837. It is not sufficient to determine that Defendants should have known. In sum, Plaintiff must show that Defendants "knowingly or recklessly 'disregard[ed] that risk [of serious harm] by failing to take reasonable measures to abate it" and that Defendants' acts or omissions thereby caused the constitutional deprivation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582-83 (11th Cir. 1995); see also Williams, 689 F.2d at 1381.

### 1. Defendant Ashley

There is no evidence that Defendant Ashley drew an inference that Inmate Williams posed a serious and imminent threat or risk of harm to Plaintiff. The facts show that Plaintiff and Inmate Williams exchanged words at the end of a pickle-ball game, but Defendant Ashley broke up the exchange, sent Inmate Williams away from the vicinity of the pickle-ball game, and watched him begin to play basketball with other inmates. Based on her discussions with Inmate Williams, she believed that the argument was finished. (Ashley Aff.

8

¶3). Moreover, there was no prior history of trouble between Plaintiff and Inmate Williams before the pickle-ball game. Neither Plaintiff's prior disciplinary history or an opinion from another inmate that Inmate Williams was a "loaded gun" - events that gave no indication that Inmate Williams would pick up a mop stick and break it over Plaintiff's head because of a ball game (particularly after he told Defendant Ashley that the argument was finished) - demonstrate a knowing and reckless disregard of a risk of harm to Plaintiff's safety. Cf. Carter v. Galloway, 352 F.3d 1346, 1349-50 (11th Cir. 2003) (*per curiam*) (requiring "much more than mere awareness" of an inmate's generally problematic nature to impose liability for failing to protect against attack and rejecting proposition that prison official defendant would "read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risk of serious harm exists").

As soon as Defendant Ashley saw what Inmate Williams was doing, she immediately ran to the area and called for assistance, placing herself between Plaintiff and Inmate Williams. (Ashley Aff. ¶ 4). Plaintiff's heavy reliance on the staff/inmate ratio in the gym does not save his claim. Regardless of how many inmates Defendant Ashley was supervising, Plaintiff puts the number at 78 (doc. no. 46, p. 4), the evidence shows that Defendant Ashley broke up the first altercation between Plaintiff and Inmate Williams and immediately sought to break up the altercation with the mop stick when she saw what had happened; nor is there any evidence that there was a delay in Defendant Ashley's response time to the mop stick altercation that resulted in additional injury to Plaintiff. Moreover, the staffing ratio does not change the fact that there was no knowledge of a serious and imminent threat to Plaintiff prior to the attack. To infer that a prison official had the requisite

9

knowledge to impose liability under the Eighth Amendment - in the absence of a personalized threat - a plaintiff must present "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it(.)" Farmer, 511 U.S. at 842. There is nothing in the record that satisfies this standard.

Although medical records show that Plaintiff was injured severely enough to require hospitalization outside MSP, injury alone does not prove that Defendant Ashley failed, in violation of the Eighth Amendment, to protect Plaintiff from harm. Nor is the arguably negligent placement of unsecured mop sticks within reach of all inmates sufficient to justify liability under § 1983.[6] Carter 352 F. 3d at 1350 ("negligent failure to protect an inmate from attack" insufficient to impose § 1983 liability). As shown by Plaintiff's inability to meet his burden of proof, Defendant Ashley is entitled to summary judgment.

### 2. Defendants Washington and Spires

As to Defendants Washington and Spires, they, too, are entitled to summary judgment on Plaintiff's claims related to protecting him from an attack by Inmate Williams. Plaintiff stated that he sued Warden Washington because he is "the head employee of the Georgia Department of Corrections at Milan State Prison and whose responsibility and safety and

---

[6]Plaintiff's arguments rely heavily on his undocumented assertion that there was an escape attempt at MSP in July of 2003 that involved use of a mop stick. According to Plaintiff, because a mop stick had been used in an escape attempt, such sticks should not have been hanging unsecured in the fence to dry. However, even if there were verified evidence in the record concerning an escape attempt with a mop stick, that would not establish than any Defendant drew the inference that there was a serious and imminent risk that Inmate Williams would use a mop stick to hit Plaintiff on the head.

10

security my confinement comes under." (Doc. no. 42, Pl.'s Dep., p. 6, ll. 6-9). Stated differently, Plaintiff maintains that Warden Washington should have ensured that the mop used in the attack on Plaintiff was locked up. (Id., p. 8, ll. 10-13). Plaintiff also explained that he sued Deputy Warden Spires because he was the head of security, and there should have been a policy in place that prohibited unfettered inmate access to unsecured mop sticks. (Id., p. 13, ll. 14-24). Plaintiff does not allege that either of these Defendants were present at the gym at the time of the attack or were otherwise involved in the direct supervision of inmates at the time of attack. Thus, it appears that Plaintiff is actually trying to hold these Defendants liable by virtue of their supervisory positions.

However, in the Eleventh Circuit, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 & 694 n.58 (1978). To hold an official in a supervisory position liable, Plaintiff must demonstrate that either (1) the supervisor personally participated in the alleged constitutional violation or (2) there is a causal connection between actions of the supervising official and the alleged constitutional violation. Hartley, 193 F.3d at 1269 (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). As explained above, Defendants Washington and Spires did not personally participate in the events forming the basis for Plaintiff's claims concerning deliberate indifference to his safety.

Similarly, Plaintiff failed to establish a "causal connection" between Defendants Washington and Spires and the asserted constitutional violation. See Zatler v. Wainwright,

802 F.2d 397, 401 (11th Cir. 1986). The "causal connection" can be established "when a history of widespread abuse[7] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," Brown, 906 F.2d at 671, or when "the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" Hartley, 193 F.3d at 1269 (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)). A causal connection may also be shown when the facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Plaintiff's undocumented reference to one prior escape attempt using a mop stick does not establish a history of widespread abuse of violent attacks by fellow inmates that put these supervisory officials on notice of a problem of constitutional proportions. Nor has Plaintiff established that there was an improper custom or policy from either of these two Defendants that led to the alleged constitutional deprivation. According to the affidavit evidence, mops and broom are in constant use throughout the day to maintain appropriate levels of sanitation, and they are accounted for by area supervisors at the end of every day. Moreover, the fact that there was no history of a problem with inmates using the mop sticks in attacks on each other indicates that the policy that had been in place for counting the equipment at the end of each day did not pose a threat of constitutional proportions to the

---

[7]The standard for demonstrating "widespread abuse" is high. In the Eleventh Circuit, "deprivations that constitute widespread abuse sufficient to notify the supervising official must be <u>obvious, flagrant, rampant and of continued duration</u>, rather than isolated occurrences." Brown, 906 F.2d at 671 (emphasis added).

12

safety of inmates. Thus, Plaintiff has not established the necessary causal connection with respect to Defendants Washington and Spires.

In sum, these two Defendants cannot be held liable based on a theory of vicarious liability for Plaintiff's Eighth Amendment claims related to protecting his physical safety. Plaintiff has neither established direct participation by Warden Washington or Deputy Warden Spires in the contested events or established the necessary causal connection to impose liability, and therefore, they are entitled to summary judgment on this claim.

### B. Plaintiff Has Not Established that Any Defendant Was Deliberately Indifferent to a Serious Medical Need.

Plaintiff has also alleged that Warden Washington and Lt. Sumner were deliberately indifferent to his serious medical needs when, upon his return from the hospital, he was placed in segregation rather than returned to the general prison population and was denied access to medication or necessary medical treatment for his six-day stay in segregation. According to Plaintiff, Warden Washington was the person who directed that he be discharged from the hospital before he had sufficiently recovered from the attack by Inmate Williams.

A prisoner's claim of deliberate indifference to serious medical needs must also satisfy both the objective and a subjective components of an Eighth Amendment claim that were discussed in Part III.A, *supra*. Farmer, 511 U.S. at 834. To state the proposition differently, Eighth Amendment liability cannot be based on simple negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk. Id. at 835-39. Deliberate indifference that would violate the Eighth Amendment requires that

13

Plaintiff show Defendants knew about and disregarded an excessive risk to his health or safety. See id. at 837. When subjectively weighing whether a defendant has been deliberately indifferent, the courts require a plaintiff to show "more than mere negligence," and look for "obduracy and wantonness, not inadvertence or error in good faith." Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995).

Moreover, every claim by a prisoner of inadequate medical treatment does not equate to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 105 (1976). Writing for the majority, Justice Marshall observed:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." . . . In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Id. at 105-06.

Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). Furthermore, the Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980)(Bowen, J.)). Neither does a mere difference in opinion between prison medical officials and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. Harris, 941 F.2d at 1505; Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). That is, the burden of proving deliberate indifference

cannot be met simply by arguing that an inmate wanted a different type of treatment. Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Where a prisoner has received . . . medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments. . . . Id. (citation omitted)).

Here, Plaintiff cannot meet his burden of proof. Starting first with the contention that Warden Washington ordered Plaintiff's premature discharge from the hospital, the evidence simply does not support Plaintiff's claim. According to the Discharge Summary and Discharge Instructions submitted by Plaintiff, Charles Wall, M.D. and Charles Burton, M.D., physicians at the Medical Center of Central Georgia, determined that Plaintiff had sufficiently recovered to be discharged. (Doc. no. 47, Ex. B, pp. 29-32). According to SOP VH01-0002, "[a]ll decisions related to the delivery of, access to, or the quality of health care services are made by qualified health care personnel in concurrence with the Responsible Health Authority." (Doc. no. 41, Ex. G, p. 2). Non-medical personnel are to defer to the opinions of physicians in matters of medical judgment. (Id.). Warden Washington is not medically trained and does not control the medical treatments provided to MSP inmates; he did not have control over when the doctors at the Medical Center of Central Georgia decided to release Plaintiff. (Washington Aff. ¶¶ 13-14). Thus, he properly relied on the opinion of trained physicians concerning the propriety of returning Plaintiff to MSP. Accord Waldrop v. Evans, 681 F. Supp. 840, 848-49 (M.D. Ga. 1988) (finding that prison administrators who are not medical professionals must rely on decisions of trained professionals regarding care provided to inmates).

Moving next to the conditions under which Plaintiff was housed upon his return, here, too, Plaintiff has failed to meet his burden of proof. For this portion of his Eighth Amendment claims, Plaintiff complains that Warden Washington and Lt. Sumner improperly kept him confined under the same conditions reserved for inmates who committed disciplinary violations. (Pl.'s Depo., p. 8, ll. 15-24; p. 23, ll. 23-25, p. 24, ll. 1-18).[8] Plaintiff also asserts that he was kept in "isolated conditions for six days without any medication or medical attention." (Doc. no. 34, Pl.'s Aff. ¶ 4).

First, neither Warden Washington nor Lt. Sumner played any direct or indirect role in providing medical care to Plaintiff upon his return to MSP. (Washington Aff. ¶ 14; Sumner Aff. ¶ 4). As described above, according to VH01-0002, non-medical personnel defer to physicians in matters of medical judgment. (Doc. no. 41, Ex. G). Thus, these two Defendants were not in charge of Plaintiff's medical care upon his return to MSP. As these two Defendants were relying on the information provided by the medical staff regarding the treatment Plaintiff was receiving and/or needed while in segregation, they did not possess the necessary subjective intent to establish an Eighth Amendment violation. That is, they did not know about and disregard an excessive risk to Plaintiff's health or safety. See Farmer, 511 U.S. at 837. Although they may have been aware of Plaintiff's disagreement with the

---

[8]Plaintiff also states that he sued Lt. Sumner for issues related to not notifying Plaintiff's family about his condition. (Pl.'s Depo., p. 24, ll. 11-18). However, all claims related to the stress allegedly caused by Plaintiff's family not knowing about his hospitalization and medical status were dismissed by the June 9, 2004 Order of the Honorable Dudley H. Bowen, Jr., United States District Judge. (Doc. no. 17). Stated otherwise, the Court has not sanctioned any claims related to the procedures that were or were not used to keep Plaintiff's family abreast of his medical condition.

course or location of treatment offered to him, they were not deliberately indifferent to Plaintiff's medical needs.

In any event, records do not show that Plaintiff received constitutionally deficient care upon his return to MSP. According to the evidence of record, Plaintiff was discharged from the hospital under orders of a physician on the evening of October 9, 2003. (Doc. no. 47, Ex. B, p. 32 (Discharge Instructions)). Upon his return to MSP, Plaintiff was in fact provided Floxin ear drops and Darvocet during the six days he stayed in segregation. (Doc. no. 41, Ex. F, pp. 8, 33, 78-79). Moreover, upon Plaintiff's discharge from the hospital and return to MSP, Nurse Johnna Hall discussed Plaintiff's condition with Dr. Okuwobi, and they determined that Plaintiff should remain in segregation pending receipt of discharge information from the hospital. (Pl.'s Depo., Defs.' Ex. 1, Stm. of J. Hall). Plaintiff was informed that he was being placed in segregation - not isolation - for the welfare of the institution.[9] (Pl.'s Depo., Pl.'s Ex. 1, Admn. Seg. Memo.; doc. no. 41, Ex. M ). Nurse Hall's records show that Plaintiff's vital signs were checked the day after his return to MSP, and he was scheduled for a follow-up visit with Dr. Okuwobi on October 15, 2003. (Hall Aff. ¶ 4; doc. no. 41, Ex. F, p. 33). Nurse Hall also saw Plaintiff on October 14, 2003 and explained to him that medical personnel were waiting for the hospital to forward medical records before releasing him back to the general population. (Doc. no. 41, Ex. F, p. 46).

---

[9]Plaintiff did not suffer any adverse disciplinary punishment for the altercation with Inmate Williams or as a result of his stay in segregation when he returned to MSP. (Washington Aff. ¶¶ 9, 20). Moreover, because MSP does not have an infirmary, placing sick or injured inmates in segregation is the only option for housing them away from general population inmates. (Hall Aff. ¶ 3).

17

Moreover, there is nothing to suggest a deterioration of Plaintiff's condition upon his return to MSP or during his stay in segregation.[10] Nor is there any evidence that Plaintiff's recovery was otherwise hindered by his stay in segregation. Although he may have preferred a different course or location of treatment upon his return, such a disagreement cannot form the basis of a constitutional violation, let alone form the basis for imposing liability against two individuals who were not responsible for providing Plaintiff with medical treatment.[11]

---

[10]Plaintiff also complains that in segregation, he was forced to share a cell with another inmate and sleep on a one or two inch thick sponge mattress in a small, poorly ventilated cell. (Doc. no. 34, Pl.'s Aff. ¶ 13; doc. no. 46, p. 12). However, Plaintiff has submitted no evidence on the ventilation levels in the segregation cells, let alone explained that his condition, was harmed by the ventilation. Defendants have averred that the ventilation was adequate. (Washington Aff. ¶ 21). Moreover, Defendants have submitted sworn testimony that the mattresses in the segregation cells are the same as the mattresses issued to inmates in general population, and segregation cells are designed to accommodate two inmates. (Id.). Plaintiff has not refuted this information or otherwise provided evidence of inhumane conditions in the segregation cell in which he stayed for six days upon his discharge from the hospital. Rather, he has complained that he was uncomfortable.

[11]Defendants have also pointed out in their summary judgment briefing that Plaintiff failed to exhaust his administrative remedies - a pre-requisite under the Prison Litigation Reform Act, ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), for bringing a federal lawsuit. 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." Furthermore, 42 U.S.C. § 1997e(c)(1) provides that the Court shall dismiss any action brought under 42 U.S.C. § 1983 concerning prison conditions if the action fails to state a claim upon which relief can be granted on its own motion or the motion of a party. In the Eleventh Circuit, "[a] claim that fails to allege the requisite exhaustion of remedies is tantamount to one that fails to state a claim upon which relief may be granted." Rivera v. Allin, 144 F.3d 719, 731 (11th Cir. 1998); see also Moore v. Smith, 18 F. Supp.2d 1360, 1362 (N.D. Ga. 1998) (finding that a prisoner lawsuit in which the denial of a grievance was not appealed must be dismissed under § 1997e). Moreover, satisfying the exhaustion requirement includes pursuing the issue of filing an out-of-time grievance. Harper v. Jenkin, 179 F.3d 1311, 1312 (11th Cir. 1999) (per curiam); see also Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (per curiam) (exhausting

## IV. CONCLUSION

For the foregoing reasons, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that Plaintiff's motion for summary judgment be **DENIED**, that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

SO REPORTED and RECOMMENDED this 9th day of August, 2005, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

administrative remedies is "precondition to filing an action in federal court"); Miller v. Tanner, 196 F.3d 1190, 1192-93 (11th Cir. 1999) (same).

    Plaintiff did not submit a grievance until October 28, 2003, past the expiration of the time limit for submitting a grievance. (Doc. no. 41, Exs. I, K). There is no evidence in the record that Plaintiff requested permission to file an untimely grievance. Thus, it appears that Plaintiff's claims are also barred by the exhaustion requirement of the PLRA. In any event, as discussed in detail above, Defendants should be granted summary judgment based on the merits of the case and therefore the Court need not rely on the exhaustion issue to resolve the case. Likewise, the Court need not address Defendants' argument that they are entitled to qualified immunity.

19

# United States District Court
## *Southern District of Georgia*

ATTORNEYS SERVED:

Michael E. Harrison, Pro-se
Andrew M. Magruder, Esq.
Jesse W. Owen, Esq.

CASE NO: CV304-012

DATE SERVED: August 10, 2005

SERVED BY: Cindy Reynolds

☐ Copy placed in Minutes
☐ Copy given to Judge
☑ Copy given to Magistrate